All right, afternoon. Illinois Appellate Court, First District Court is now in session. The Fifth Division, the Honorable Justice Mathias W. Lord presiding, case number 20-0967, Dean Bostrom v. Sandra Bostrom. Good afternoon, everyone. Welcome to the Illinois Appellate Court, First District, Fifth Division. We'll ask the lawyers who are going to argue today to please introduce themselves, beginning with the appellant. Good afternoon, Justices. Sean Hammond from Lake Tobacco D. Domenico, joined off screen by my colleague, Michael D. Domenico. And for the appellee? Annette Fernals on behalf of Dean Bostrom, who's on the Zoom, and also we have Molly Kirsch, who's a law student in our office, who is watching. All right, thank you very much. Justice DeLore, can I interrupt you for one second? I apologize. Darren, did you invite my law clerk in on this? Um, can you just, I'll set it up, Justice. All right, thank you. We can continue. And as Justice Cunningham said earlier, we have been very used to technical glitches on the Zoom arguments. It's a wonderful device, but it doesn't always work perfectly through no one's fault. And we understand that, and we appreciate that we were able to get everybody up and running here. So with that, we'll give you about 15 minutes per side. We do tend to ask a lot of questions in this division, so please keep that in mind. And we'll allow an initial five minutes or so for a rebuttal, and we will extend the time if necessary to complete our questions. Please understand we have read the briefs. We have read Judge Kelly's ruling in detail. We know what the facts are. Please just argue the law and why we should affirm or reverse. With that, counsel, you may begin. Thank you, Justice DeLore, and may it please the court. This case comes before the appellate court today based on Judge Kelly's ruling reducing and modifying and essentially terminating Sandra Bostrom's entitlement to maintenance. As set forth in our brief and as elucidated by the recent Supreme Court decision in Dom Shell, the circuit court's decision was premised on fundamental errors with respect to how it viewed income, income for both parties, and most importantly, income for Dean Bostrom, because what became absolutely clear and apparent when reviewing the facts and the law, Mr. Bostrom's ability to pay the rather paltry sum of $1,750 per month to Ms. Bostrom following their 25-year marriage remains absolutely unchanged. There are things that the court did that while Judge Kelly's ruling says that Mr. Bostrom has only a certain amount of assets, it does so by ignoring half of his assets. It is an undisputed fact that subsequent to the divorce with my client, Mr. Bostrom came in possession of $700,000 that had never previously been accounted for. Mr. Hammond, I have a question. Am I pronouncing your name correctly? Justice, it's Hammond, like the meat and the woman's name, Hamm-Ann. Okay. Mr. Hammond, what is the standard of review? And Justice Cunningham, as we set forth in our brief, we believe that the standard of review should be de novo in this case because the facts are not in dispute. We have a set of undisputed facts that led to a legal conclusion. This is not a situation where there is a dispute about what Mr. Bostrom has withdrawn from the inheritance account that is in his name. There is not a dispute as to what either party receives by virtue of the pension payments or employment payments. There is no dispute as to the material facts. There is not a dispute as to the value of the assets. The only dispute here is the legal conclusion to be drawn from the undisputed facts. And as courts have recognized in Dirtoff, Asta, and a variety of other cases, where the facts are undisputed and it is strictly a legal determination, the standard of review is de novo. Therefore, we do believe that the standard of review is de novo. However, under any standard, we believe that there is reversible error. Mr. Hammond, let me throw that back at you the 700,000 inheritance account that you just mentioned. That is the inheritance of his second wife. Is that correct? Justice Lord, it is correct that it began as the inheritance of his second wife. And now it is in a jointly titled account, right? Correct. Okay. I am not sure the record is explicit as to who has rights, but I think everybody is presuming that both of them have rights to withdraw a dollar or the whole balance if they wanted to, correct? Justice Delord, I agree with you 100%. I agree with you 100% that that is correct. However, I do not believe that is what the circuit court found. I believe that the circuit court found that Mr. Bostrom only had an entitlement to half of the assets. And the circuit court indeed found that, okay. Yes. However, Justice Delord, to your point, I believe that the Supreme Court answered marriage of Olson, that the idea of marital property does not come into play until there is actually a divorce. As of right now, there are assets that are titled in Dean Bostrom's name that he has access to an unfettered right to withdraw. He testified at trial that he has to ask his current wife before withdrawing. However, what was not testified to at trial was any time that a single dollar had ever been asked where the answer had been no. Time and again, whether from three times a week golfing, whatever Mr. Bostrom chooses to use his funds on, their answer is always yes. And that has continued. Mr. Heyman, I'm going to ask you, take this in a different direction because I want to ask, what is the purpose of the maintenance that was awarded to Mrs. Bostrom? It was permanent maintenance, but what is the purpose of the maintenance that was awarded in this case? There are different types of maintenance. I think we can all agree that this was not rehabilitative maintenance. This was permanent maintenance. And do you agree then that permanent maintenance is usually awarded to allow the spouse to continue living in the style to which he or she has become accustomed during the marriage? Would that be a purpose of the maintenance in this case? That would be a purpose of the of the lifestyle afforded during the marriage. Initially, Mr. Bostrom put in no evidence of the lifestyle during the marriage. So this puts the reviewing court as well as the deciding court in a very unique circumstance because what the circuit court did was extrapolate and frankly, speculate what it believed to be the lifestyle during the marriage based on its review of the social security statements. Mr. Bostrom put in no affirmative evidence of the lifestyle of the were certain things that they did during the marriage, which she is no longer able to do. One thing that we look at in the judgment was a $400,000 house that they had. Sir, was there no evidence in this case from which the court could conclude what the standard of living was for these parties prior to the divorce? Is that what you're arguing? I certainly agree, Justice Cunningham, that Mr. Bostrom did not set forth sufficient evidence to put in anything about the lifestyle of the marriage. 100% of what the circuit court determined the lifestyle of the marriage to be was based on its own assumptions, looking at social security statements and the judgment itself. The judgment itself does not set forth either of their incomes. This is not a case where Mr. Bostrom's support obligation was based on explicitly his income at the time of the marriage or Ms. Bostrom's income at the time of the marriage. Neither of these are actually listed in the marital settlement agreement. What the circuit court did was extrapolate what it concluded to be the lifestyle of the marriage based on its review of their social security income statements. And it concluded that there was approximately $200,000 of income in the final year of the marriage. And therefore, it made its own subjective determination about what that lifestyle must have meant based on the age of their children. However, there was absolutely no evidence. There was not a single statement. There was not a single picture. There was not a single account statement or anything to suggest what the actual lifestyle of the marriage was. The only thing that we are left to do is look at the lifestyle based on what is in the judgment and based on what was testified to. And Mr. Bostrom offered no affirmative testimony as to the lifestyle of the marriage that could lead the marital income. The joint tenancy account that we were talking about a few minutes ago. As far as the decisions that the court made on that, would you say those rulings were legal decisions or factual decisions? I would conclude that they are legal decisions, Justice, and that would be based on the subsequent ruling in Dom Shell. In Dom Shell, it took the legal application of an account, an inheritance account that had not previously been included and imputed for support purposes and found that where an account has not previously been included or imputed, it is legally proper to consider that income. And I believe that fits the legal definition of income. As Dom Shell indicated, 505 and 504 have the same definition of income. And I do believe that an asset that increases the wealth of the recipient that he uses to draw down to meet his income. And I do believe that the circuit court was legally incorrect in ignoring what Dean Bostrom testified was $5,000 to $7,000 a month in income. He testified that he drew down on that. What the circuit court did was make a finding, and I'm not sure how it fits with the rest, but it made the finding that the $700,000 would be more akin to Rogers and all at the time that it was deposited. $700,000 at once, one single income shot. However, that is the same argument that was advanced in Dom Shell. The same argument that the payor in that case said, well, if it's income, it was all income at once. It's not income as I withdraw it. And they likened it in that case to a withdrawal from a savings account, the McGrath case. However, our Supreme Court said that is incorrect. It is correct to treat it as income as you distribute from it. If it hasn't previously been counted. And this issue of a double count is where the Supreme Court drew the line and drew the distinction. And I believe that issue of a double count also factors into another calculation of income in this case, and that is their mutual receipt of Dean Bostrom's pension. Dean Bostrom's pension, the marital portion, was divided 50-50 in the marital settlement agreement. The circuit court, as a primary impetus for finding a substantial change, found that Ms. Bostrom's pension, that had been long ago agreed, constituted a substantial change. Now, we cited... Mr. Hammond, that was not the only reason. Didn't the circuit court also find that because Mrs. Bostrom had a significant salary increase during that period, wasn't that part of the change in circumstances? Because she had quite an increase in her salary. Justice Cunningham, I agree that her scheduled salary increases were part of the court's finding. However, I disagree with the justice's characterization of $65,000 to $100,000 being a substantial change, when all that Sandra Bostrom did was continue her employment in the same school district, pursuant to the same public salary, pursuant to the same cost of living increases, that every other union salaried teacher employed. But her salary was considerably more. It doesn't matter whether she stayed in the same school district. She was doing a different job, and the salary was significantly more than what she had been earning at the time of the divorce and at the time of the award of maintenance. Justice Cunningham, she actually testified that she took a reduced position because the stress and related breakdown that she had... I'm just talking about the money. The money that she was earning, according to the records that I have before me, was significantly more than the money that she was earning at the time of the divorce and at the time that maintenance was awarded. The job that she was doing, I don't think that's in dispute. I'm just asking about the money that she was earning. And you don't think that a 53% increase is significant. Would there be a number that you would find would be sufficient? Or do you think that once maintenance is awarded, it can never be revisited? I'm not clear about that in terms of your position. Can you clarify that for me? Thank you, Justice Cunningham. I do not believe that there is no amount of money that would be considered a substantial change in circumstance. And when considering what would be a substantial change in this case, the first thing that I think that we need to do is examine Mr. Bostrom's ability to pay. However, if Ms. Bostrom had earned... That's not what I'm asking. I would really like you to answer the question that I'm asking and not what you want to answer. I want to know what you would consider to be a substantial change in her circumstances, regardless of what Mr. Bostrom is earning. If she makes... So just from her perspective, is there a salary increase relative to what she was earning at the time of the divorce that you would consider to be substantial? That's all I'm asking. I believe, Justice Cunningham, that it would be substantial if she were to earn equivalent to what the household earned during the marriage. I do not believe that what ultimately accounts for approximately less than 20% of what the household income was at the time of the divorce, I do not believe that that change in and of itself is a substantial change. When the circuit court found there was in excess of $200,000 earned by the parties on the last year of marriage, I do not believe that her receipt of cost of living increases of $35,000 over the course of a decade constitutes a substantial change. Had she earned $200,000 or in excess of that, I believe that she would then have the ability to meet the exact marital standard of income without any additional support. However, I do not believe that her $35,000 increase, when considered in the totality of the circumstances, constitutes a substantial change. What's your best case law on that? Justice, I believe that the one thing that I look at as very telling in this case comparatively is the marriage of folly case. In the marriage of folly, the maintenance recipient had millions of dollars in assets from which she drew substantial income. In that case, the payor had retired and his stated income dropped from multiple low seven figures to $200,000. I believe it was $2,280,000. And yet, in that case, the circuit court, much like the circuit court did in this case, reduced Ms. Folly's award of maintenance to zero and set it for, well, you can come back sometime in the future, maybe. Now, leaving aside that multiple cases have said this sort of reserve jurisdiction that is an indefinite reserve that then flips the burden on the maintenance recipient to come back and meet the burden showing a substantial change, leaving that aside, I do believe that it is very factually analogous. If you move the decimal point over one, the percentages are nearly identical as to those in this case. Mr. Bostrom's payment of $1,750 is a minuscule portion of his overall income, whether or not you include the income that our Supreme Court says should be included under Dom Shell. When you look at his voluntary undertaking of payments, which our courts have said in marriage of Cooper, for example, Mr. Bostrom, in this case, admittedly pays over $1,000 in voluntary undertakings to his mother and his mother-in-law. If he has the ability to continue to make these sort of payments, which our sister courts have said do indicate his ability to continue to make his court order and contracted obligation, I believe that when you look at Folly and you look at Cooper, both of these speak directly to the circumstances that we find ourselves in today. Your time is basically up. We'll give you a minute or so to conclude and make sure we don't have other questions from the panel members. Thank you, Justices. In brief conclusion and wrapping up, I would ask this court to bear in mind Mr. Bostrom's ability to pay. I would ask this court when considering respective abilities to pay and considering whether there's been a substantial change when considering Ms. Bostrom's income, that this court look at the ability to accumulate assets. Whereas the party is left with equal footing, Mr. Bostrom has three times the that speaks to whether there has been a substantial change on one of their parts to pay. And I ask this court when considering the totality of the circumstances, including Mr. Bostrom's substantial increase in wealth, his ability to make the decision to voluntarily retire prior to full social security age, Ms. Bostrom's necessary need to continue to work because she does not have the ability to accumulate assets and save for retirement, find that there has not been a substantial change in circumstance. And even if this court does find that there had been a substantial change in circumstance, I ask this court to follow folly and find that an award of zero is totally inappropriate in this case. Thank you, Justices. Thank you. Any other questions? Hearing none, Ms. Fernholz, you may proceed when ready. Good afternoon, Justices and Mr. Heyman. I think we just need to frame the issues that are really before the court. The first issue is really, has there been a substantial change in circumstances to merit a modification? And secondly, did the trial court abuse its discretion in modifying for Mr. Bostrom's maintenance obligation to zero? And I note that that was modified to zero and not terminated. And I think the trial court did that for a very specific reason, knowing that at some point, Ms. Bostrom herself will retire. She won't get the amount of the decrease and Mr. Bostrom will get a portion of that pension. And therefore it's appropriate that she has the opportunity to come back and seek maintenance if she needs so at some time in the future. Ms. Fernholz, I'm going to ask you the same question that I asked your opponent. What was the purpose of this maintenance that was awarded to Ms. Bostrom at the time of the divorce? Ms. Bostrom received maintenance at that time because she, my understanding is that she was going to grad school. She was getting her master's at that time and that she was in process of rehabilitating herself under the current timeframe, under the revised statutes, because they've been married more than 20 years by law. She gets an indefinite period of maintenance. Did that answer your question? Not really. Because you're suggesting that it was rehabilitative maintenance, but that was not my understanding. No, I'm just saying that was the circumstance at the time. I think that she is supposed to have, when you look at the party's incomes at that period of time, when they divorced, hers was much less than his. And when you do the calculations on the support orders, they come up with a definite number of what maintenance is supposed to be and for how long. And that is what I'm assuming. Okay. And so her maintenance was permanent. And part of the reason was to allow her to continue living in the style to which she had become accustomed during the marriage. Do you agree with that? I do. Okay. And at some point in time, because although it's permanent maintenance, does that mean it goes on forever or can you come back to court as they did in this case? And what's the standard that the judge uses to determine if permanent maintenance no longer needs to be paid? I think the case law is clear that each judge has to look at the extension of the termination of maintenance on a case-by-case basis. And I think that's when you look at judge Kelly's 24 page decision, you see that he was weighing all kinds of factors, looking at all the facts, looking at the fact that Ms. Bostrom can now support herself and actually earns more than enough money to support herself at the current time. And at this time, the testimony was that Mr. Bostrom was taking between five to $7,000 out of the Merrill Lynch account to meet his needs. So while Ms. Bostrom could meet her needs, Mr. Bostrom was dipping into assets to meet his monthly payment amount. Ms. Farenthold, can I ask you, as far as Dean's burden to prove there was substantial change, did he only rely on the increase of her salary or was there anything else? I think we have a number of things that went on. Dean himself retired. Because he retired, his salary decreased and he received his pension. We also have the fact that her salary increased as well. So I think that the trial court wasn't just looking at one specific factor, it was looking at all of those factors. Well, yeah, those two then. You're saying her increase in salary and his diminished income. Because of his retirement, which the court found to be in good faith. What was the burden he had? What kind of burden is it? I'm just going to go back. So I think when we started off and we were talking about, despite the statutory change that was just handed down on May 13th regarding the whole contemplation issue regarding a substantial change in circumstances, even absent that statutory change under 510, I think that there was a significant change in circumstances just based on Ms. Bostrom's increase in her salary alone. Not even including the amount of the pension that she's received, which of course is about three times what she was receiving in maintenance. And the fact that Mr. Bostrom himself retired after working in more than 30 years. Counsel under their briefs were kind of pointing out that he contemplated retirement or thought about retirement at the time of the judgment entry. But when you look at the testimony that's in the record, Mr. Bostrom could have retired at 55 if he had 35 or 36 years of service, which he did not have at that time. He retired when he was 61 years of age and had 30 years of service. So the fact that he retired before receiving full social security is really a non-starter because his pension, it was already maxed out. If the longer he worked, it wasn't going to impact his pension at all. And the trial court imputed that income he would have received for social security when it calculated his income. So the fact that he retired maybe two years earlier than normal, that is a non-starter. There is indeed a substantial change in circumstances when you consider that one party is now no longer employed, his income has diminished and her assets have increased. Counsel, should the court have concluded that this Merrill Lynch account was an asset or income to Dean? I don't think so. When I read the Domshell opinion, I think that a certified question about mandatory distributions and withdrawals from IRA accounts. And that was not the case in Bostrom. In Bostrom, we have this account where people are just, it's already an asset. And as the trial court noted, that asset was literally received in 2013. And so Mr. Bostrom is just making withdrawals from that account. So I think it's distinguishable from what Mr. Heyman has pointed out. But doesn't he have full access to that account? I apologize, Justice Stewart. He has full access to every penny in that account, does he not? He has access, but he also has to get some approval. Is it different than it being an account titled solely in his name? Well, that's not in the record. That is not in the record. I'm sorry. Is it? What's in the record about his getting approval? He testified that he needed his wife's approval before. No, he didn't. He said I would talk to her about it or ask her, but it wasn't a firm I need to get anything in writing or anything, was it? No, I know there was no writing included. I thought there was an oral agreement, but Justice, you have probably read the entire record more recently than I have. What is a joint tenant if he presented at the bank or the account, he could withdraw every penny out of it, could he not? He could. And we see that happen in our domestic relations cases a lot. And then people run to court and get TROs and it creates a lot of issues. There's no doubt. And she probably saw it when she was in probate court. Leads me to my question for you. OK. All right. Let's say that Mr. I'm sorry, Mr. Bostrom were to divorce his that inheritance would not be marital property, would it be? It would be premarital property, wouldn't it? I would mean to be her asset, correct? It would be her non-marital property, I would believe. Non-marital is the word I was thinking. Right. I guess the issue, just to be fair, would come into play whether she indeed gifted some of that to him or not. That would be the question that would arise. Go ahead. Is there more to the question? I just wanted to know that was a question. So. So, counsel, does Dom Shell have any application or not? I don't think it does. I don't think it does, because I think what was happening there, the Supreme Court was asked, was answering a very specific certified question about mandatory withdrawals from IRA accounts. And that is not analogous to what is happening in the Boston case. Thank you. I did just want to touch on a little bit about what Mr. Hammond was talking about when not being established, because I believe that it had been. When you look at the judgments, you can see the numerous cars for the children. There was testimony that certain of the children had gone to college and those expenses were paid for. And, you know, you also have Mr. Bostrom's testimony about how much money, like $54,000 that Ms. Bostrom spent on gambling. So there was some specific testimony about what was spent during the marriage to establish, you know, the standard of what Mr. Hammond was saying when absolutely there was nothing there but social security statements. There was discussion about the parties backpacking in Europe and those kinds of things. So there was some testimony in the record that talked about what their standard was during the marriage. And so I take issue with his comment in that regard. Counsel, the standard of review, de novo, or abuse of discretion? Thank you, Justice Connors. That was my question. Very welcome. I think the burden is, did the trial court abuse its discretion when it modified the maintenance obligation to zero? And I don't believe that the trial court abused its discretion. I think that Mr. Hammond would have a stronger argument if that modification was terminated, but it wasn't. And it leaves the door open for a change of circumstances that could occur to Ms. Bostrom in the future. And like I said previously, particularly if she retires, her income may decrease some because she will be getting a pension and won't get 100% of the salary she's receiving at the present time. So I just want to make sure I'm answering all the questions. He really lays out a very specific, very detailed reasoning for what the party's income is, what Mr. Bostrom's assets are with his current wife, how Ms. Bostrom, Ms. Sandra Bostrom's income has increased, what her spending is, what Mr. Bostrom's spending is, and why he made the determination that he did. And I think it's extremely well-reasoned and articulated and that this court should affirm. Anything else, Ms. Fernholtz? Questions from the panel? No. Thank you. And Mr. Hammond, you have five minutes for rebuttal. Thank you, Justice DeLorte. Starting with what Ms. Fernholtz said, that she believed that the maintenance was set pursuant to statutory guidelines. In 2011, there were no maintenance guidelines. There were no maintenance guidelines for calculation of percentage or for duration. Those came into effect in 2015, effective 1-1-15. So her supposition as to how it came about is incorrect. As to her position that Ms. Bostrom can meet her needs, the undisputed testimony was that she has a house that is half of the house in the marital that was in the marital judgment. Mr. Bostrom has a house that is worth one and a half times what it is in the marital judgment. His ability to meet his needs is evidenced by the fact that his assets have tripled compared to hers. Now, as for Ms. Fernholtz's suppositions about the marital lifestyle and Ms. Bostrom's gambling, I think she is running dangerously close to suggesting that there's some sort of fault consideration here. However, if gambling was the lifestyle during the marriage, that would support an increased amount. It would support a continuation of maintenance. This has nothing to do, it's mostly, frankly, a red herring to try and discredit and dirty up my client. However, what she did say about my client's testimony about backpacking through Europe, yes, the parties did put children through college. They lived a upper-middle-class lifestyle, which Ms. Bostrom no longer has the ability to do on her income alone. Finally- Mr. Heyman, are you saying that your client does not live a middle-class lifestyle now? Is that your testimony? My statement is that she does not have the ability to live a $200,000-plus lifestyle on $100,000 worth of income. That is absolutely my statement, that she does not have the ability to meet the needs as evidenced by the fact that her needs are set forth in her financial affidavit are lower than what could even be extrapolated from the judgment. There is no testimony about her backpacking through Europe subsequently. There's testimony about her buying a $220,000 townhouse because that's what she could afford thanks to a passing of one of her parents. Now, as to the, Justice Lort, your question about would it be non-marital property that his current wife, when she gifted it and jointly titled it, initially, Wisconsin has different property laws, and there is a presumption that all property is split 50-50. They don't make a distinction between premarital and marital. However, by titling it in both of their names, that is exactly when we lost any claim that she may have had that she didn't gift it, but it doesn't change the fact that they're not going through a divorce. As of right now, Justice Connors, to your point, it's just a jointly titled account that he can withdraw from. There is no legal impediment. Whatever oral obligation he testified to about having to run it by his wife, again, it's not borne out through actions. Actions speak louder than words, and the actions in this case were that he withdrew month in and month out to meet whatever he wanted, which wasn't the lifestyle of the marriage. It was to acquire boats and jet skis and snowmobiles and a lake house and do all of these other things that he continues to obligation and expenses grossly exceeded what Ms. Bostrom's were. Finally, the thing that I did not get to touch on, as Ms. Fernalds brought up briefly, was this issue of contemplation, this issue of the fact that although Mr. Bostrom was nearing retirement age and testified that he had thought about retirement, but you look at their contract, and within the four corners of their contract, they talk about what happens in retirement, but they talk separately about maintenance, and one, although it is considered, is not something that affects the other in their agreement, and although 510 has changed subsequently, and we did ask on our motion that the court be made aware of that, it does not change the fact that the effective date of that amendment co-states the judgment in this case, and it has no application to this case, so if this court were to consider what is contemplated, there were things that were mutual receipt of the marital portion of his pension upon his retirement. His decision to retire, whether it was in good faith, bad faith, or otherwise, is something that everybody knew was going to happen, and the receipt of the asset that occurred upon that retirement is something that everybody also knew what was going to happen. The mere fact that it occurred does not change the fact that it was something they both knew would occur at the time that they bargained for permanent maintenance. Mr. Hammond, doesn't the amount of the pension vary depending on when the retirement takes place? Most certainly, Justice Cunningham, and had Mr. Bostrom continued in, I believe the court found that in his last year of earning, he earned in excess of $200,000 by himself. Had he chosen to continue earning at that level and continued to stay employed to normal social security retirement age, then his pension amount would have increased. However, he made the determination, and the reason he made that determination is absolutely obvious. It's because he had $700,000 of new income that he could play with, which he then did, and he used it to buy a new house and retire in the lifestyle that he wants to lead, which includes voluntary obligations. It includes meeting all of his needs. It includes all of the recreation that he testified to, international trips, which Ms. Bostrom did not testify that she is able to pay. Now you're repeating yourself, and I was going to call you on time before Justice Cunningham asked you a question. So let's go to Justice Conner's question. Yeah, as far as Dom Shell, your opponent says it doesn't apply at all and can't be distinguished. Do you agree? I absolutely disagree, Justice, and I would point the court to paragraph 53 of Dom Shell, which is the exact argument that they're making. The salient portion, I would say, is this. The determination of support is based on whether that receiving the distributions. In this case, it is undisputed that the support amount, the income that Mr. Bostrom draws from, the $5,000 to $7,000 a month as he testified to, had never been imputed to him for purposes of support. It had never been counted against him for purposes of support. It's directly analogous. He's saying that this is outside of the marital estate, which it absolutely is, but because it had never been counted and because he uses it to increase his gain and gain wealth, that makes it directly analogous. It is directly on point and it is, quite frankly, very much in line with what we argued before the circuit court. We argued that his continued use of these funds is income to him as he draws down from it, and that, I believe, is 100% legally correct. Thank you. Any other questions from the panel? No. All right. Thank you, counsel, for your arguments and for your patience as we worked out the logistics at the beginning of the session. The court will take the matter under advisement and you will hear back from the court in due course. At this time, court staff will remove all members from the Zoom audio conference except for the justices.